FILED

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

2013 JUN 10  P 12: 34

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Adele Hollis and Xavier Egan, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| DYNCORP INTERNATIONAL INC., | ) ) |
| Defendant. | ) ) ) |

CASE FILED UNDER SEAL
(Pursuant to 31 U.S.C. § 3730(b))

Civil Action No. *1:13 CV 698*
                                *GBL/TRJ*

**JURY TRIAL DEMANDED**

## COMPLAINT

This Complaint alleges that DynCorp International Inc. ("DynCorp") has been defrauding the United States and violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, by knowingly inflating labor charges on a Government subcontract that required DynCorp to provide assistance in the fight against narcoterrorism in Afghanistan and elsewhere. Plaintiffs Adele Hollis and Xavier Egan, by the undersigned counsel, bring this *qui tam* lawsuit on behalf of and in the name of the United States and for themselves, and allege:

### JURISDICTION AND VENUE

1.      Counts I-III are civil actions by Plaintiffs Adele Hollis and Xavier Egan, acting on behalf of and in the name of the United States, against Defendant DynCorp, under the federal False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

2.      This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), because the Defendant is located and transacts business in this judicial district.

3.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a), because the Defendant is located and transacts business in this judicial district.

4.     Plaintiffs are unaware of any prior public disclosure of the allegations or transactions set forth in this Complaint, as those terms are used in 31 U.S.C. § 3730(e)(4)(A).

5.     To the extent any allegation set forth in this Complaint may be similar to allegations or transactions that have been publicly disclosed within the meaning of 31 U.S.C. § 3730(e)(4)(A), Plaintiffs are permitted to proceed with this lawsuit because each of the Plaintiffs is an "original source" as that term is defined in 31 U.S.C. § 3730(e)(4)(B).

6.     Plaintiffs discovered the misconduct that is set forth herein in the course of their employment with DynCorp. Plaintiffs promptly notified DynCorp managers of the misconduct and urged them to address it. After observing that DynCorp managers were not fixing but, on the contrary, were continuing to engage in the misconduct, Plaintiffs, submitted confidential complaints to the "fraud hotline" of the Department of Defense Office of Inspector General ("DOD-IG"). In those confidential complaints and subsequent discussions, Plaintiffs have provided to the DOD-IG the information upon which this lawsuit is based. Plaintiffs believe that prior to making their disclosures to the DOD-IG, the United States Government had no knowledge of the fraudulent activities that are described herein.

## PARTIES AND OTHER RELATED PERSONS

7.     Plaintiff Adele F. Hollis ("Hollis" or "Relator"), a resident of Flower Mound, Texas, is a certified management accountant with over 20 years' experience. From 2006 to the present, Hollis has been employed at DynCorp International in Fort Worth, Texas, first as a Senior Accountant, then as an Accounting Supervisor, and since 2010, as a Senior Business Manager. As a Senior Business Manager, her responsibilities have included developing and

managing the operating budget for government contracts, and ensuring compliance with contractual requirements and Federal Acquisition Regulations. From 2010 to 2012, Hollis worked on the DynCorp subcontract that is the subject of the allegations set forth herein.

8.      Plaintiff Xavier C. Egan ("Egan" or "Relator"), a resident of Fort Worth, Texas, is a financial analyst and accountant. From February 2012 until the present, Egan has worked at DynCorp International in Fort Worth, Texas, as a finance supervisor. During 2012, Egan worked on the DynCorp subcontract that is the subject of the allegations set forth herein.

9.      On or about September 10, 2012, in the course of performing her employment duties for DynCorp, Hollis discovered that DynCorp had been making false statements and claims under a Government subcontract with Northrop Grumman, which misconduct is described more fully below. Over the next three weeks, Hollis, working along with her colleague Egan, attempted to determine the amount of overcharges by DynCorp in connection with the subcontract. On or about October 4, 2012, in a series of conference calls, email communications, meetings, and discussions, Hollis and Egan shared and discussed their findings with their DynCorp colleagues and senior managers, and they recommended that DynCorp take action to remedy the misconduct. After these discussions, DynCorp senior managers not only refused to remedy the misconduct, but also insisted on continuing to make false statements and claims to Northrop Grumman in connection with additional work under the Government subcontract. Subsequently, on October 24, 2012, Plaintiffs Hollis and Egan confidentially reported the misconduct to the DOD-IG and asked for the commencement of an investigation and audit.

10.     Defendant Dyncorp International Inc. ("DynCorp"), a wholly-owned subsidiary of Delta Tucker Holdings, Inc., is a company with its headquarters at 3190 Fairview Park Drive,

Suite 900, Falls Church, Virginia 22042, in this judicial district. DynCorp is a major provider of global government services under contracts and subcontracts with the United States Government.

11.     Northrop Grumman Technical Services, Inc. ("Northrop Grumman"), is a company with its headquarters at 2411 Dulles Corner Park, Suite 800, Herndon, Virginia, in this judicial district. Northrop Grumman is a major provider of services under contracts with the United States Government.

12.     The United States Department of Defense ("DOD"), an agency of the United States, is responsible for entering into and administering contracts for the procurement of goods and services used by the various branches of the Armed Services. The headquarters of DOD is at the Pentagon, located in this judicial district.

13.     The United States Department of the Army ("Army"), under the umbrella of DOD, is a sub-agency of the United States, responsible for entering into and administering contracts for the procurement of goods and services in support of the United States' military objectives. The headquarters of the Army is at the Pentagon, located in this judicial district.

14.     One of the offices within DOD is the Counter Narcoterrorism Technology Program Office, known as "CNTPO." CNTPO's mission is to create counter-terrorism technology networks, infrastructure, and capabilities worldwide that focus on the detection, identification, and disruption of narcoterrorist activities and organizations.

## THE DYNCORP SUBCONTRACT AND TASK ORDERS

15.     This case concerns DynCorp's pricing and billing for work performed on task orders issued under a subcontract with Northrop Grumman, the prime contractor under Contract no. W9113M-07-D-0007 (the "Prime Contract"), a 2007 contract with the U.S. Army Space and Missile Defense Command, to help carry out the mission of CNTPO. Northrop Grumman was

one of five prime contractors chosen by DOD to provide operational support to CNTPO. Under

the terms of the contract, Northrop Grumman could submit bids to perform various task orders

that would be issued by DOD. As part of the bidding process for a task order, Northrop

Grumman would have to include estimated labor costs in its bid proposal.

16.     In order to be able to bid on and, if selected, perform various task orders awarded

under the Prime Contract, in 2007, Northrop Grumman entered into a subcontract with DynCorp,

Subcontract No. GCNGS-07-039 (the "Subcontract"). Under the terms of the Subcontract, when

DynCorp would team up with Northrop Grumman on the bidding for a task order, DynCorp

would submit a proposal of its estimated costs to Northrop Grumman; Northrop Grumman, in

turn would mark up these costs (adding in, for example, its own general and administrative costs)

and forward them on to the U.S. Government.

17.     The task orders issued under the Prime Contract and Subcontract consisted of five

contract line items (or "CLINS"), covering: (1) labor; (2) other direct costs ("ODCs"); (3)

insurance coverage (known as "DBA"); (4) materials; and (5) travel. The different CLINS were

to be reimbursed in different ways. Labor costs were to be paid on a basis known as "firm fixed

price/level of effort" ("FFP/LOE"); ODCs and materials were to be paid on a basis known as

cost-plus-fixed-fee; and DBA and travel was simply cost reimbursable. The focus of this case is

DynCorp's estimates of, and claims for payment for labor costs.

18.     The firm fixed price/level of effort (FFP/LOE) mechanism worked as follows:

the Prime Contract and Subcontract incorporated a table of negotiated hourly rates applicable to

the labor done by various categories of employees. This labor rate table was incorporated into

the Subcontract as "Attachment B." While the hourly rates for each different type of laborer

were fixed through negotiation (subject to annual escalation of three percent), the amount of time

that DynCorp's employees would actually spend to complete the tasks was variable. Thus, when DynCorp would submit an invoice for its labor charges on a task order, the labor rates applicable to the various categories of employees would be "fixed" (hence the term "firm fixed price"), but the amount of hours billed, and therefore the actual labor charges, would depend on how much work was actually performed in the covered time period (hence the term "level of effort").

19.     In submitting its bid on the task orders, DynCorp was required to identify (a) the employees who would be doing the work, and (b) the labor categories in which these employees belonged. DynCorp also had to estimate how many hours would be worked by the employees.

20.     The Prime Contract incorporated a document, "Attachment 2," that set forth the duties and qualifications that defined each of the labor categories included in the labor rate table. For example, one of the positions, mechanical engineer, was defined as follows:

**72. Engineer, Mechanical:**

**Duties:** Read and interpret blueprints, technical drawings, schematics, and computer generated reports.  Research and analyze customer design proposals, specifications, manuals, and other data to evaluate the feasibility, cost, and maintenance requirements of designs or applications. Specify system components or direct modification of products to ensure conformance with engineering design and performance specifications.  Research, design, evaluate, install, operate, and maintain mechanical products, equipment, systems and processes to meet requirements, applying knowledge of engineering principles. Investigate equipment failures and difficulties to diagnose faulty operation, and to make recommendations to maintenance crew.  Assist drafters in developing the structural design of products, using drafting tools or computer-assisted design/drafting equipment and software.  Provide feedback to design engineers on customer problems and needs.  Oversee installation, operation, maintenance, and repair to ensure that machines and equipment are installed and functioning according to specifications.

**Experience; Qualifications:** At a minimum should have a bachelor's degree in mechanical engineering from a college or university accredited by an accrediting body recognized by the U.S. Department of Education plus four (4) years of progressively more complex work experience in all phases of hardware design, development, and documentation. Experience should demonstrate the ability to meet the duties described above.

6

21.     The task orders issued by the Government to Northrop Grumman incorporated the following clause pertaining to the use of "non-key personnel" to perform work under the Contract: "The Contractor shall assign to any effort requiring non-key personnel only personnel who meet or exceed the qualifications of the applicable labor category descriptions as provided in this task order and the Basic Contract, Attachment 2."

22.     Northrop Grumman, in turn, issued task orders to DynCorp with a substantially identical clause: "The Subcontractor shall assign to any effort requiring non-key personnel only personnel who meet or exceed the qualifications of the applicable labor category descriptions as provided in this task order and the Basic Contract, Attachment 2."

23.     The task orders issued by Northrop Grumman to DynCorp also contained clauses enumerating certain "key personnel," describing specific qualifications for these key personnel, and stating that those specific qualifications were "in addition to those set forth in Section J, Attachment 2 of the basic contract."

24.     Northrop Grumman also issued standard pricing instructions to DynCorp in connection with bids for work on task orders under the Subcontract.  One of Northrop Grumman's standard pricing instructions addressed the manner in which DynCorp had to estimate its "direct labor" charges.  That provision stated, in relevant part:

> **4.3 Direct Labor.**  All labor shall be proposed utilizing the labor categories set forth in Attachment 2 of the basic contract.  Labor that does not fit within the labor categories set forth in Attachment 2 shall be included as an ODC [Other Direct Cost] and shall be fully explained, to include an explanation of how the labor fits within the scope of the basic contract. ... Labor rates are based on the established rate structure as defined in the Attachment B of the subcontract agreement. ... When labor is proposed in terms other than the labor categories and rates set forth in the basic contract, the subcontractor shall include the following:
> * Labor category and rationale for inclusion
> * Labor hours per labor category

25.     Because the Contract and Subcontract called for Other Direct Costs to be reimbursed at cost plus a fixed fee, if DynCorp had to bill a person's work against the Subcontract as an "ODC," DynCorp could only recover its actual costs plus a pre-negotiated fixed fee. Under the Subcontract, this fixed fee was four percent of the costs.

26.     The structure of the Prime Contract and Subcontract gave DynCorp the opportunity to make much higher profits when they could bill work as "direct labor" rather than billing it as an "other direct cost." If DynCorp could bill a person's work to the Subcontract as "direct labor," and if DynCorp could hire that employee at a rate well below the labor billing rate in Attachment B, then DynCorp could make a significant profit on the labor. Specifically, DynCorp's profit would be the difference between DynCorp had to pay for the employee (*i.e.*, wages and benefits) and the amount DynCorp could get paid at the applicable labor rate in Attachment B. By contrast, if DynCorp had to bill a person's work to the Subcontract as an "other direct cost," DynCorp could only recover its actual costs plus a fixed fee of four percent.

27.     While the structure of the Contract and Subcontract gave DynCorp the opportunity to make significant profits on the work that could be billed as direct labor, DynCorp could lawfully achieve such profits only if: (1) DynCorp could hire and retain workers who met or exceeded the qualifications, as set forth in Attachment 2, for the labor categories for which DynCorp was billing them; (2) DynCorp's workers actually performed the duties, as described in Attachment 2, for those labor categories; and (3) DynCorp paid the workers sufficiently low wages to make significant profits when DynCorp was paid the pre-negotiated labor rates set forth in Attachment B.

28.     Instead of trying to achieve the lawful profits that were permitted under the Contract and Subcontract, DynCorp made its profits another way – by cheating. By hiring

8

employees who did not qualify for one of the direct labor billing categories set forth on Attachment B, paying those employees wages that were well below the contractual rates in Attachment B, and billing for those employees' work as though they met the job qualifications and performed the job duties associated with the direct labor categories in which the work were being billed, DynCorp could make an exorbitant, although illicit, profit.

29.     From the inception of its work on the Subcontract, DynCorp chose this illicit path. As will be described in more detail below, DynCorp regularly hired people who were not qualified for and did not fill the positions for which DynCorp was billing them.  DynCorp ignored Attachment 2 to the Prime Contract, and it treated the labor categories in Attachment B as though they had no meaning whatsoever.  DynCorp simply hired whomever it wanted to complete the Subcontract tasks and assigned these employees to whatever labor category it chose, with DynCorp's only guiding principle being its desire to make large profits under the Subcontract.

## APPLICABLE STATUTES AND REGULATIONS

A.     The Truth in Negotiations Act.

30.     The Truth in Negotiations Act ("TINA"), 10 U.S.C. §2306a, requires a contractor bidding on certain types of Government contracts, subcontracts, or task orders to submit truthful information to the Government about the basis for its bid.  This information, known as "cost or pricing data," can be relied upon by the Government as a basis for deciding whether to accept the bid, and for determining the level of funding to provide.  Under TINA, when a bidder submits cost or pricing data, it is required to certify that the cost or pricing data is accurate, complete, and current.  When a company submits false cost or pricing data in violation of TINA, the company

engages in misconduct that is commonly known as "defective pricing." A company that knowingly engages in defective pricing is also violating the False Claims Act.

B. The FAR Mandatory Disclosure Rule.

31. The Federal Acquisition Regulations ("FARs") require that when a principal of a Government contractor learns of "credible evidence" (a) that the contractor has violated the False Claims Act, or (b) that the contractor has received a significant overpayment, the contractor must make a timely disclosure of the allegations to the Government, under penalty of suspension or debarment from further Government contract work. 48 C.F.R. §§ 3.1003(a)(2), (a)(3); *see also* 48 C.F.R. §§ 9.407-2(a)(8), 9.406-2(b)(1)(vi).

C. The False Claims Act.

32. Under the civil False Claims Act, 31 U.S.C. §§ 3729-33, a person or entity can be liable for certain acts, including: (a) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; (b) knowingly making, using, or causing to be made or used, a false statement material to a false or fraudulent claim; or (c) knowingly concealing or knowingly and improperly avoiding an obligation to pay money to the Government.

## THE FRAUDULENT CONDUCT

33. Commencing in or about 2008, Northrop Grumman, as the prime contractor, and DynCorp as its subcontractor, were awarded task orders to perform work under the Contract and Subcontract, respectively.

34. The largest task order that was awarded to DynCorp under the Subcontract was Task Order 20 ("TO 20"). TO 20 required DynCorp to perform flight operations, maintenance, logistics support, and training operations for Afghan military personnel. This work was in support of the mission of DOD's Counter Narcoterrorism Technology Program Office (CNTPO).

TO 20 went into effect on or about October 9, 2008, and it consisted of a base year and four additional option years. Under the terms of the task order, DynCorp was required to submit cost or pricing data, and to certify that it was accurate, complete, and current, pursuant to TINA and FAR 52.215-12.

35.     From the outset, DynCorp ignored the contractual requirement to hire duly qualified personnel to perform the work required under TO 20. When hiring personnel to perform the work, DynCorp paid no attention to the qualifications and duties set forth in Attachment 2 of the Contract.

36.     In disregarding the qualifications and duties set forth in Attachment 2, DynCorp ignored the contractual provision, set forth in the Statements of Work issued by Northrop Grumman, stating that certain key personnel had to meet certain specific qualifications, and that those specific qualifications were "in addition to those set forth in Section J, Attachment 2 of the basic contract." DynCorp further ignored the contractual provision, also set forth in the Statements of Work issued by Northrop Grumman, stating that the subcontractor "shall assign to any effort requiring non-key personnel only personnel who meet or exceed the qualifications of the applicable labor category descriptions as provided in this task order and the Basic Contract, Attachment 2."

37.     In the base year of TO 20, DynCorp charged its personnel to the Subcontract by assigning the employees to various labor categories in Attachment B (the labor rate table). DynCorp did <u>not</u> assign its employees to the labor categories on the basis of whether the employees actually had the requisite qualifications and performed the requisite duties set forth in Attachment 2 of the Contract. Instead, DynCorp falsely assigned employees to various labor categories based on whether DynCorp's "fully loaded bill rate" for the employee – *i.e.*, the

amount DynCorp paid the employee in wages, plus fringe benefits, plus indirect overhead costs, *plus profit* – was roughly equal to the billing rate in the Prime Contract for someone in the labor category to which DynCorp was assigning the employee.

38.     For example, in the base year of TO 20, DynCorp hired a person who, in reality, was a Lead Interpreter (*i.e.*, a translator who would assist English-speaking personnel in Afghanistan). However, first when it bid for work under the Subcontract, and later when it actually charged the Prime Contractor (who, in turn, charged the Government) for such work, DynCorp falsely represented that it had employed this person as a "Senior Mechanical Engineer" with a billing rate of $107/hour. Thus, although in reality it was charging the Subcontract for the work that was performed by the Lead Interpreter, DynCorp falsely claimed that it was charging the Subcontract for work performed by a Senior Mechanical Engineer.

39.     In the cost or pricing data that DynCorp submitted in support of its bid, on or about August 25, 2008, DynCorp falsely represented that it was using a "Senior Mechanical Engineer" at a billing rate of $107.48/hour during the first applicable rate period; DynCorp falsely represented that the estimated hours of work that would be done by this "Senior Mechanical Engineer" during the applicable rate period would be 1210 hours; and falsely estimated the charges that would be associated with the work done by this "Senior Mechanical Engineer" during the applicable rate period would be $130,002.

40.     In reliance upon DynCorp's false submission, on or about November 25, 2008, Northrop Grumman, as the Prime Contractor, agreed to award the work to DynCorp.

41.     After the task order had been awarded, when DynCorp submitted invoices for its services during specified time periods, DynCorp falsely charged Northrop Grumman (which, in turn, charged the Government) for work purportedly done by a "Senior Mechanical Engineer,"

even though DynCorp knew that the work that it was charging against the Subcontractor had been performed by a Lead Interpreter.

42.     For a second example, in the base year of TO 20, DynCorp hired a person who was, in reality, a Business Manager (*i.e.*, a management position in the United States). In its bid, however, and later in its invoices under the task order, DynCorp falsely represented that this person was a "Senior Electrical Engineer" (*i.e.*, a technical position in Afghanistan) with a billing rate of $109 per hour. As in the first example, DynCorp falsely represented this Business Manager as a "Senior Electrical Engineer" in the cost or pricing data that DynCorp submitted in support of its bid, as well as later when DynCorp submitted claims for payment to Northrop Grumman under the Subcontract; Northrop Grumman, in turn, forwarded these claims to the Government, which paid the claims.

43.     By engaging in this unlawful practice, DynCorp has generated exorbitant profits under the Subcontract. For the labor portion alone of Task Order 20, in the base year of the task order (2008-09), DynCorp made profits of approximately $6.6 million, or 31% above costs. In Option Year 1 of the task order (2009-10), DynCorp made profits of approximately $5.8 million, or 32% above costs, for labor alone. In Option Year 2 of the task order (2010-11), DynCorp made profits of approximately $14.1 million, or 37% above costs, for labor alone. In Option Year 3 of the task order (2011-12), DynCorp made profits of approximately $18.3 million, or 33% above costs, for labor alone.

## PLAINTIFFS' DISCOVERY AND INTERNAL REPORTING OF THE FRAUDULENT CONDUCT

44.     In 2010, Relator Hollis, a DynCorp Senior Business Manager, became the business manager for the CNTPO program with responsibility for the business aspects of TO 20, as well as some other task orders that had ended and were being closed out. Among Hollis'

responsibilities were to work with DynCorp's project accounting group in processing invoices under TO 20, and to update pricing under that task order.

45.     When Hollis first became involved in the business management of TO 20, she was not provided access to the contract file, and she was not informed about Attachment 2 to the Prime Contract. She was also not told anything about how DynCorp was billing for employees' labor under the Subcontract.

46.     On July 6, 2010, Hollis sent an e-mail inquiry to Shawn McPherson, DynCorp Business Manager, asking whether there was anything in the contract that addressed how the Northrop Grumman job categories aligned with DynCorp's own job categories. The business manager responded by sending Hollis an internal DynCorp document which was a two-page table called "Labor Rate Summary." The Labor Rate Summary listed different Northrop Grumman labor categories in the first column, and in the second column listed DynCorp's own job descriptions that purportedly corresponded to the Northrop Grumman labor categories. For example, one of the labor categories listed under the Northrop Grumman column is "Engineer, Mechanical, Senior," and in the adjacent DynCorp column is listed, "Lead Interpreter." The Labor Rate Summary indicated that it covered the base period (*i.e.*, first year) of TO 20. When Hollis reviewed the document, she observed that there seemed to be a rough correspondence between DynCorp's own fully-loaded bill rate for the employees and the labor rate that DynCorp was charging for those employees under the Subcontract.

47.     Hollis also checked with Rick Fredrickson, DynCorp Contracts Manager, about any contract guidance pertaining to the assignment of labor categories, but Fredrickson did not provide any guidance. Thus, despite her internal inquiries in mid-2010, Hollis was unaware of any contract guidance on the utilization of the rate table. Accordingly, when she first updated

14

the pricing during Option Year 1 on Task Order 20, Hollis did not change the labor categories that DynCorp had been using when it billed its employees' time.

48.    A year later, in early August 2011, Hollis learned that DynCorp's site management in Afghanistan was changing the work schedule for the employees by increasing the amount of leave per rotation. This change would mean that DynCorp's costs per employee would decrease, since DynCorp did not pay its employees for post and hazard pay during the time when they were on leave. By contrast, DynCorp would not be assigning these employees to new categories to reflect DynCorp's newly reduced costs, and DynCorp would still be billing the Subcontract the same amount for the employees.

49.    From what she had seen in the Labor Rate Summary, Hollis believed that DynCorp was supposed to be maintaining a rough correspondence between (a) its fully-loaded bill rates for employees, and (b) the amounts being charged for those employees under the labor rate table (Attachment B). Hollis was concerned that the on-site work schedule change would alter this rough correspondence, and that this would require an adjustment to the way that DynCorp jobs were matched up with Northrop Grumman's labor category. Otherwise, Hollis believed that DynCorp would generate profits that greatly exceeded DynCorp's normal internal profit target rate on labor, which was 15%.

50.    Throughout August 2011, Hollis was still unaware of the existence of Attachment 2 to the Prime Contract, or the existence of any other contractual guidance on how to assign DynCorp employees to the labor categories listed in Attachment B. However, because she was concerned that DynCorp was generating an unseemly level of profit from the labor portion of TO 20, Hollis started pushing DynCorp management to adjust the way DynCorp billed for labor under the labor rate table. Hollis elevated her concerns to David Manning, DynCorp Program

15

Director, and also to Terrance Reininger, DynCorp Vice President for Aviation Programs. She was rebuffed in her efforts, however, and was instructed that she should not change the labor categories that DynCorp was using when it billed for employee labor under Task Order 20.

51.     Hollis arranged for a meeting to be held with DynCorp senior management on August 30, 2011, for the purpose of addressing the contract billing rates. At that meeting, in response to her continued inquiries, DynCorp's contracts personnel told Hollis that the contract was "silent" on the question of how to use the labor rate table, and management took the position that DynCorp had no obligation to alter the way it was using the labor rates. After the meeting, Hollis sent an email to Manning saying that she was uncomfortable with DynCorp's position. Shortly afterwards, Hollis was told by Anthony Storer, DynCorp Senior Finance Director, that a DynCorp Vice President had decided there should not be any adjustment to the use of the labor categories.

52.     The issue arose once again in May 2012, when it was time for DynCorp to submit a new bid for work under TO 20. On May 9, 2012, after a meeting with upper management, Hollis sent an e-mail to Steve Resnick, DynCorp Vice President for Group Finance. The e-mail said, in part: "As we discussed this morning, I think DI [DynCorp International] needs to determine what an acceptable profit is on CNTPO for the re-compete. I definitely don't agree that 38% on labor is reasonable profit and feel we have taken advantage of the lack of guidance in the contract."

53.     On the following day, Rodney Shamp, DynCorp Vice President for Army Aviation, came and met with Hollis. He warned her not to put things in writing as she had on the previous day, as such things could be found by U.S. Government auditors and have a significant

impact on the company's reputation. He mentioned that there had been discussions about Hollis' e-mail and that people had expressed concern about this type of thing getting out.

54.     In early September 2012, DynCorp was preparing to submit a bid to work on Option Year 4 (the final option year) of TO 20. Relator Egan, who reported directly to Relator Hollis, prepared an analysis of the profit DynCorp was making on the labor portion of the Subcontract; on September 4, 2012, he presented his analysis to Hollis, who in turn provided it to their manager Ray Nelson, DynCorp Program Director for CNTPO. Egan estimated that DynCorp's profit margin was approximately $42 million over the life of TO 20, a return of 35% over DynCorp's labor costs.

55.     Shortly afterwards, Tracey Fagan, DynCorp Contracts Manager, was reviewing contract documents in preparation for a meeting with Northrop Grumman scheduled for September 12, 2012. In the course of her review, Fagan came across Attachment 2, which set forth the specific functions and requirements for each labor category in the labor rate table. On September 10, 2012, Fagan brought a copy of Attachment 2 to Hollis. This was precisely the kind of specific contractual guidance that Hollis had been inquiring about in July 2010 and again in August 2011, but she had been told by DynCorp officials that such guidance did not exist.

56.     Upon learning about the existence of Attachment 2, Hollis immediately brought the situation to the attention of DynCorp management. She informed Anthony Storer, DynCorp Senior Finance Director, that apart from her prior concern about DynCorp charging excess profit, she now had a bigger concern: that DynCorp had never been pricing its labor in accordance with the requirements of the Subcontract.

57.     Because DynCorp was in the midst of preparing cost or pricing information to submit to Northrop Grumman, Hollis wanted to prevent DynCorp from submitting information

17

which, in light of Attachment 2, was clearly false. Accordingly, on September 14, 2013, Hollis

sent an email to Fagan saying: "Can you verify we are not creating more issues by submitting

pricing after we discovered the attachment in the subcontract regarding the application/

experience required for the CNTPO labor categories?  Xavier and I would feel better if you got

Tim Winn's concurrence on this as we have two additional pricing requests due NG next week."

58.     Hollis set up a meeting on September 18, 2013, to discuss the impact of the job

description information that Fagan had disclosed to her the previous week.  The meeting was

attended by Hollis, Egan, Fagan, Storer, Senior Contracts Director Tim Winn, and others.  At the

meeting, the participants discussed how DynCorp had historically priced the contract and the

implications of not following the contractual requirements.

59.     At the conclusion of the September 18 meeting, Hollis was concerned that

DynCorp's misuse of the labor categories might not have been limited to its pricing and

performance of TO 20, and might also have affected its pricing and performance of other task

orders under the Subcontract.  To that end, Hollis checked to see whether DynCorp was

engaging in similar misconduct on any other task orders.  She discovered that, in fact, DynCorp's

misconduct extended to other task orders as well.

60.     Later on that same day, Hollis wrote an e-mail to several other DynCorp

managers, stating: "I ran the billing history for TO 3 and 54 just to see if the labor categories

were used in the same manner as TO 20 and it is a definite yes.  I can tell by looking at personnel

we have on TO 20 currently who are assigned to Sr. Pilot and they are maintenance."

61.     On September 19, 2013, Senior Contracts Director Winn wrote an email to Hollis,

Storer, Fagan, and Shamp.  In the e-mail, Winn admits that DynCorp might be "pretty much in

trouble because we did not conform the CNTPO labor categories to the [DynCorp] labor

categories." He goes on to propose that DynCorp try to come up with an explanation for its conduct that might "hold water." He concludes: "We would need to put this explanation in our documentation for each of the proposals we have submitted and the awards we have been given to ensure this is consistent across the board as the basis for our estimates and conformance of labor categories by task order."

62.     During the next two weeks, Hollis and Egan, with limited assistance from others, worked to try to determine the extent to which DynCorp's employees on TO 20 could legitimately be placed into the job categories under the criteria set forth in Attachment 2, and also to do a cost impact analysis of the situation. They were under severe time pressure because DynCorp was being pressured by Northrop Grumman to submit a bid for (a) a two-month extension of Option Year 3 of TO 20, and (b) another Option Year 4 of TO 20. In order to carry out their task, one of the things Hollis and Egan needed to do was review resumes for the personnel who were working on the task order; DynCorp was not always able to find the resumes.

63.     In an e-mail dated September 24, 2012, to Program Director Ray Nelson, Hollis noted that her preliminary findings showed that, for the two-month Option 3 extension, 74% of the workers failed to align with the job category under which they were billed.

64.     Over the next 10 days, Northrop Grumman continued pressuring DynCorp to submit its pricing data so that Northrop Grumman in turn could submit its proposal to the Government, and DynCorp tried to buy time from Northrop Grumman in order to review and revise its pricing data. DynCorp informed Northrop Grumman that it was in the process of reworking the entire manning and labor category matching.

65.     On October 3, 2012, Christopher Lawson, Northrop Grumman Subcontracts Administrator, sent an e-mail to Nelson asking for clarification: "What do you mean that you are reworking the entire manning and labor category matching? Do you see this complete rework as driving costs up or down?" Nelson wrote back, in part: "Until I see the adjusted pricing following the cross-walk of job descriptions and associated charge rates, I will not know if it is going up or down. ... Please bear with us a few more days so that we can get the reviews completed, financial impact conducted and Sr. management briefed." Nelson forwarded a copy of his e-mail to Hollis and Fagan, stating: "How's that? This should hold them off for a few days."

66.     Later on October 3, in response to Nelson's message, Hollis wrote an e-mail saying: "Tomorrow's meeting should give us the status of where we are at although we have the issue of self-disclosing. I don't know that your e-mail told [Northrop Grumman that DynCorp] has never used the labor category table correctly." Nelson responded: "I did not intend to tell them everything – especially that we were using anything incorrectly."

67.     On the morning of October 4, 2012, there was a conference call involving Hollis, Egan, Nelson, Fagan, Winn, and others, to discuss the work that had been done by Hollis and Egan over the preceding two weeks. They discussed the findings, as well as the potential risks associated with various issues. Towards the end of the call, DynCorp Vice President Resnick joined the call; when Resnick heard what was being discussed, he indicated that the call should be ended. Resnick said that he wanted the "business" people to discuss the matter among themselves, and that he and Gary Goodwin (DynCorp Vice President for Group Contracts) would speak separately with the operations people (*e.g.*, Nelson, the Program Director).

## DYNCORP'S DECISION TO CONTINUE THE FRAUDULENT CONDUCT

68.     Later on the morning of Thursday, October 4, there was a conference call involving the "business people" involved in the Subcontract. The participants in this call were Hollis, Egan, Fagan, Winn, Resnick, Goodwin, and Robert Jordan (DynCorp Aviation Budget Director). During the call, there was a discussion of the history of the labor billing situation. Goodwin suggested that Northrop Grumman had accepted DynCorp's past proposals which did not classify employees in the correct labor categories, and he suggested that this could relieve DynCorp of any legal responsibility. However, no one suggested -- nor was there any evidence to suggest -- that Northrop Grumman, when accepting DynCorp's past proposals, had known that DynCorp was not classifying its employees in the correct labor categories.

69.     During the second conference call on October 4, Resnick instructed Hollis and Egan not to take any action on pricing the Subcontract until he provided them with further direction.

70.     By Monday, October 8, Hollis had still not received any direction from Resnick on how to proceed with pricing under the Subcontract. Program Director Nelson asked Hollis about the status of the pricing, and she informed him that she was waiting for further direction. Later that day, Winn came over to Egan's desk and presented Egan and Hollis with a post-it note on which the following was hand-written:

CNTPO
For clarity & completeness the labor categories used to fit the work requirements in a number of cases do not meet the qualifications of the positions. However, these were necessary to fulfill the contract requirement based on employee salary requirements.

71.     Winn explained that he had received directions from higher management that the verbiage on the post-it note should henceforth be included among the "Assumptions" that

DynCorp included in the pricing proposals it would be submitting to Northrop Grumman. Hollis and Egan took the position that this would not be an appropriate way of proceeding. They recognized that DynCorp was trying to conceal the fact that, by ignoring Attachment 2, DynCorp had all along been submitting incorrect pricing, and that DynCorp was deceptively trying to create a "waiver" argument by inserting the deliberately oblique language on the post-it note into the pricing assumptions so that, if DynCorp's pricing practices were later discovered, it could claim that Northrop Grumman knew about and accepted DynCorp's deviation from the contract requirements.

72.     Hollis and Egan decided that, based on their interpretation of the "direction" that management was providing in the post-it note, they would re-map the labor categories based on "employee salary requirements," using DynCorp's standard target profit rate of 15% on direct labor – a far lower profit rate than DynCorp had been achieving on the labor costs under the Subcontract. Although they disagreed with the direction given by management, Hollis and Egan knew that by mapping labor categories based on salary requirements and using DynCorp's standard 15% target profit rate, they would at least be greatly reducing the Government's labor costs from their current level. On that basis, they commenced working on the pricing updates.

73.     Later on October 8, Winn forwarded to Hollis some revised verbiage that had been written by Goodwin and approved by Resnick, as well as Nelson. The revised verbiage, which Hollis was instructed to include as an "assumption" on the pricing proposal, stated: "Contractually specified labor categories and attendant rates in numerous cases do not reflect the type of positions required for Task performance. Accordingly, DI selects rates that represent the most relevant for recruiting and retaining the types of personnel required for performance, notwithstanding the qualification requirements of a particular labor category."

22

74.     On October 9, 2012, Hollis forwarded a pricing proposal for the two-month extension of TO 20, Option Year 3, to the contracts department for senior management review. She sent an e-mail to Nelson about the pricing model they used, saying: "Based on the direction we received, we aligned the DI salary requirements to the NG labor table to cover salary, indirect cost and the fee stated in the pricing template." The pricing proposal was quickly approved by senior management and submitted to Northrop Grumman.

75.     Shortly afterwards, Hollis also forwarded a pricing proposal for TO 20, Option Year 4, using the same methodology as the one for the two-month extension of Option Year 3. That, too, was quickly approved by senior management and submitted to Northrop Grumman.

76.     Along with the proposal for Option Year 4, DynCorp Vice President Steve Resnick signed and submitted to Northrop Grumman a Certificate of Current Cost or Pricing Data, dated October 16, 2012. In the certificate, Resnick certified that, to the best of his knowledge and belief, the cost or pricing data submitted to the Prime Contractor Contract Manager in support of CNTPO TO 20 OY 4 Proposals, covering the Period of Performance from October 1, 2012 through September 20, 2013, were accurate, complete, and current as of October 18, 2012. At the time Resnick signed and submitted this certification to Northrop Grumman, he knew that it was false, because he knew that DynCorp's pricing data included labor costs for personnel who were being misclassified into job descriptions they did not meet.

77.     In support of its pricing proposal, DynCorp had to submit only cursory backup documentation to Northrop Grumman, and not the kind of backup documentation from which it could have discovered that DynCorp was misclassifying its personnel into the wrong labor categories. DynCorp only had to submit a list of names of its personnel and the associated Northrop Grumman labor categories to which these employees purportedly belonged. DynCorp

23

was never required to submit, nor did in fact submit, any backup documentation, such as resumes or job applications, that would have given Northrop Grumman a basis for determining whether the DynCorp employees met the requisite job qualifications or could perform the requisite job duties.

## HOLLIS AND EGAN DISCLOSED THE MISCONDUCT TO THE GOVERNMENT

78.    Hollis and Egan were frustrated by the response of DynCorp's upper management to their discovery and report that DynCorp, since the inception of the Subcontract, had been ignoring the contractual requirement that labor rates be assigned to personnel based on whether the employees met the job qualifications and performed the duties specified in Attachment 2 to the Contract. They were alarmed by the fact that DynCorp's response was not to self-report its prior misconduct to the Prime Contractor or to the Government, but instead, to continue to engage in the misconduct and, going forward, to try to make it look like DynCorp had disclosed its billing practices to Northrop Grumman and that Northrop Grumman had acquiesced in these practices.

79.    Knowing that DynCorp had no intention of self-disclosing its misconduct either to the Prime Contractor or the Government, Hollis and Egan decided to report DynCorp's misconduct to the DOD-IG's fraud hotline. On October 24, 2012, Hollis and Egan both submitted written complaints to the DOD-IG. Hollis and Egan did not inform anyone at DynCorp that they were making these complaints.

80.    In their hotline complaints to the DOD-IG, Hollis and Egan alleged that DynCorp had engaged in "defective pricing/overcharging" in connection with DOD contract W9113M-07-D-0007. In response to a question asking how the DOD-IG's office could assist them, they said: "We would like to have the Inspector General send DCAA to audit the entire subcontract from

inception to date to determine if the utilization of the labor rate table (attachment B) and labor category qualifications (attachment 2) were utilized appropriately."

## DYNCORP ELIMINATED THE RELATORS' JOB POSITIONS

81.     By pricing the labor with a target profit rate of 15% in October 2012, Hollis and Egan were greatly reducing the overall labor charges that DynCorp was submitting to Northrop Grumman, and that Northrop Grumman was in turn submitting to the Government. Prior to October 2012, DynCorp had been pricing the labor in a manner that enabled it to achieve a profit of more than 35%, so the actions by Hollis and Egan were bound to have a significant impact on DynCorp's revenues under Task Order 20.

82.     DynCorp management realized the impact of what Hollis had done when DynCorp received its revenue reports for the month of October 2012, which reflected revenues under two-month extension of TO 20, Option Year 3. DynCorp management saw that the profit from labor charges under TO 20 had suddenly fallen drastically.

83.     On November 6, 2012, Resnick called Hollis and asked her to explain what she had done. Hollis informed Resnick that her understanding of the new approach was that DynCorp would be using the labor categories to cover salaries, overhead, and a target profit of 15%. Resnick told her that it was not DynCorp's intention to change how they were utilizing the rate table. Hollis informed him that she would not commit fraud on behalf of anyone. Hollis said that there was no valid explanation for the way DynCorp had utilized the rate table historically, and that she was not going that route again.

84.     On November 7, 2012, Hollis received a call from Mike Hatch, DynCorp deputy general counsel, who wanted to schedule a meeting with Hollis to discuss the issues she had

raised concerning CNTPO pricing. On November 13, 2012, Hollis met with Hatch and one of his colleagues to discuss those issues.

85.     At the close of business on November 13, 2012, shortly after Hollis' meeting with DynCorp in-house counsel, Hollis, Egan, and their colleagues were informed by DynCorp management that their business unit in Fort Worth was being disbanded and relocated to Huntsville, Alabama, that their current positions were being advertised, and that they would have to reapply if they wanted to keep their current positions in Huntsville.

86.     Hollis and Egan were subsequently given the opportunity to apply for other positions within DynCorp, and in January 2013, they transferred into another business unit.

87.     DynCorp conducted an internal investigation into the issues Hollis raised concerning CNTPO pricing. In January 2013, while the investigation was ongoing, DynCorp temporarily suspended the submission of invoices to Northrop Grumman for work performed under TO 20. This suspension lasted more than four months.

88.     On or about May 2, 2013, DynCorp decided to resume the submission of invoices to Northrop Grumman for work performed under TO 20. DynCorp's plan was to submit invoices for its past work (*i.e.*, since January 2013) until they were current.

## DAMAGES TO THE GOVERNMENT

89.     DynCorp generally submitted invoices to Northrup Grumman on a bi-weekly basis. Northrup Grumman would incorporate the charges submitted by DynCorp into its own charges and submit them to the U.S. Army, which would issue payments to Northrup Grumman based on those claims. Northrop Grumman would pay DynCorp's invoices within 33 days of the date on which Northrop Grumman approved them.

90.     An example of a fraudulent invoice submitted by DynCorp to Northrup

Grumman, which in turn caused Northrup Grumman to submit false claims to the U.S. Army,

was Voucher no. CNTPO5-20-06, dated January 4, 2013, in the amount of $1,559,649.33, which

included labor charges of $860,007.46. Most of the labor charges included in the invoice were

not charged in accordance with the terms of the Subcontract, because the DynCorp's employees

did not have the qualifications or perform the duties associated with the labor category under

which their work was charged.

91.     Under the Subcontract, when DynCorp has submitted invoices to Northrop

Grumman, Northrop Grumman has added a mark-up to DynCorp's charges before submitting its

own bills to the Government.

92.     Each time DynCorp has submitted to Northrop Grumman an invoice under the

Subcontract for work performed under Task Orders 3, 10, 15, or 20, DynCorp has knowingly

caused Northrop Grumman to submit a false claim to the United States, resulting in damages to

the United States. The amount of the Government's damages is: (a) the amount of the labor

charges for work purportedly done by employees under the labor categories in Attachment B of

the Subcontract, when in fact such work was not performed by employees who met the job

qualifications and performed the duties set forth in Attachment 2 of the Prime Contract; plus (b)

the amount of any mark-ups (including any overhead, etc.) charged by DynCorp or Northrop

Grumman on top of the illicit labor charges, and paid by the United States.

93.     The Relators estimate that the Government's actual damages in this case are in

excess of $50 million.

## DYNCORP'S KNOWING CONCEALMENT OF OVERPAYMENTS

94.     When Hollis alerted DynCorp management to the labor mischarging issue,

DynCorp principals had "credible evidence" that DynCorp had (a) engaged in conduct that

violated the False Claims Act, and (b) received significant overpayments of federal funds.  Under

the mandatory disclosure provisions of the Federal Acquisition Regulations, DynCorp had a duty

to make a timely written disclosure of Hollis' information to the DOD-IG, with a copy to the

Contracting officer.  48 C.F.R. §§ 3.1003(a)(2), (a)(3); *see also* 48 C.F.R. §§ 9.407-2(a)(8),

9.406-2(b)(1)(vi).

95.     Despite knowing of Hollis' information, and her admonitions that they needed to

"self-disclose," DynCorp's principals refused to make any disclosure of her information to the

DOD-IG.  Instead of doing what was required by the FAR mandatory disclosure provisions,

DynCorp engaged in conduct designed to create the false and misleading impression that

Northrup Grumman, the Prime Contractor, had known about DynCorp's labor charging practices

and had accepted them, and thereby may have changed the terms of the Subcontract.

96.     Even if Northrop Grumman had known about and acquiesced in DynCorp's labor

mischarging practices, Northrop Grumman would not have had the authority to make such a

fundamental change in the terms of either the Contract or the Subcontract without the informed

consent of the responsible Government Contracting Officer and a duly executed modification to

the Subcontract.  DynCorp would have still had the duty to disclose its practices to the

Government, and DynCorp has not shown any intention of doing so.

97.     By engaging in this course of conduct and failing to make a mandatory disclosure,

DynCorp has knowingly concealed, or knowingly and improperly avoided, its obligation to repay

28

to the Government the significant overpayments that it has received.  The Relators estimate that these overpayments have exceeded $50 million.

## COUNT I:  Knowingly Presenting False Claims
### (31 U.S.C. § 3729(a)(1)(A) (2009))

98.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 97, as if fully set forth herein.  This Count is a civil action against Defendant for violating 31 U.S.C. § 3729(a)(1)(A) (2009).

99.     Defendant has knowingly presented or caused to be presented false claims for payment for payment or approval.

100.    Because of the Defendant's conduct under this Count, the United States has suffered actual damages of more than $50 million.

## COUNT II:  False Statements or Records
### (31 U.S.C. § 3729(a)(1)(B) (2009))

101.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 97, as if fully set forth herein.  This Count is a civil action against Defendant for violating 31 U.S.C. § 3729(a)(1)(B)(2009).

102.    Defendant has knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims.

103.    Because of the Defendant's conduct under this Count, the United States has suffered actual damages of at least $50 million.

### COUNT III:  Violation of "Reverse" False Claims Provision
### (31 U.S.C. § 3729(a)(1)(G) (2009))

104.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 97, as if fully set forth herein.  This Count is a civil action against Defendant for violating 31 U.S.C. § 3729(a)(1)(C)(2009).

105.     Defendant has knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government.

106.     Because of Defendant's conduct, the United States has suffered actual damages of at least $50 million.

### PRAYER FOR RELIEF

Plaintiffs demand judgment against the Defendant as follows:

a. That by reason of the violations of the False Claims Act, this Court enter judgment in favor of the United States and against the Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729;

b. That Plaintiffs, as the *qui tam* Relators, be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act or any other applicable provision of law;

c. That the Relators be awarded all costs of this action, including reasonable attorney's fees and court costs; and

d. That Plaintiffs have such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand that this matter be tried before a jury.

Craig C. Reilly, Esq.
VSB #20942
111 Oronoco Street
Alexandria, Virginia 22314
Tel. 703-549-5354/ Fax 703-549-2604
E-mail: craig.reilly@ccreillylaw.com

Attorney for Adele Hollis and Xavier Egan

Of Counsel:
Robert L. Vogel
(*Pro Hac Vice* Application Pending)
Janet L. Goldstein
Shelley R. Slade
VOGEL, SLADE & GOLDSTEIN, LLP
1718 Connecticut Ave., N.W., 7th Floor
Washington, D.C. 20009
Tel. 202-537-5904/ Fax 202-537-5905
E-mail: rvogel@vsg-law.com